IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHERYL L. PRICE, | ) | CASE NO. 3:12-CV-1820 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | REPORT & RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff Cheryl Price's applications for Social Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends that the decision of the Commissioner be **REVERSED**.

I.  PROCEDURAL HISTORY

Plaintiff Cheryl Price ("Price" or "Plaintiff") has unsuccessfully applied for Social Security Income and Disability Insurance benefits on three occasions.  (*See* Tr. 24).  This current appeal is based upon Plaintiff's most recent applications which were filed in August 2008, in which Plaintiff asserted she became disabled as of December 30, 2004, the date her insurance benefits expired.  (Tr. 24, 107, 176-81, 182-85).  These applications were denied initially and upon reconsideration.  (Tr. 107-111, 112-17, 122-28).  Plaintiff then requested a hearing before

an administrative law judge ("ALJ").  (Tr. 129-30).  On October 21, 2009, the Administration granted Plaintiff's request and scheduled a hearing.  (Tr. 133-34).

Administrative Law Judge Melissa Warner convened a hearing on February 9, 2011, to hear Price's case.  (Tr. 48-106).  Plaintiff, represented by counsel, appeared and testified before the ALJ.  (*Id*.).  A vocational expert, Katherine Schrot,[1] also appeared at the proceeding via telephone, and provided testimony.  (*Id*.).  On March 8, 2011, the ALJ issued her decision applying the five-step sequential analysis[2] used to determine eligibility for benefits.  (Tr. 24-41). The ALJ ultimately concluded that Price was not entitled to benefits.  (*Id*.).

---

[1] The hearing transcript has a different spelling of the vocational expert's last name.  (*See* Tr. 48).

[2]  The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows

(1) If a claimant is doing substantial gainful activity – i.e., working for profit – she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Following the issuance of this ruling, Plaintiff sought review of the ALJ's decision from the Appeals Council. (Tr. 20). However, the council denied Price's request, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Plaintiff now seeks judicial review of the ALJ's decision. Review is proper pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II. PERSONAL BACKGROUND INFORMATION

Price was born on July 14, 1956, and was 48 years old as of her onset date, and 54 years old on the day of her hearing before the ALJ. (Tr. 62, 107). Accordingly, for Social Security purposes, Plaintiff was initially considered as a "younger person", but as of her 50th birthday, she was classified as a "person closely approaching advanced age". *See* 20 C.F.R. §§ 404.1564(c)-(d), 416.963(c)-(d); (Tr. 62).

Plaintiff did not graduate from high school as she stopped attending school after the ninth grade. (Tr. 63). Nevertheless, Price testified that she has some ability to read, write and do basic math. (*Id.*). The record shows that during elementary school, Price repeated kindergarten and first grade, and was enrolled in special education classes from the second grade onward. (Tr. 53).

Price also has relevant work experience. The ALJ noted that Plaintiff formerly worked for a food manufacturing company and a greenhouse. (Tr. 27). Her employment at both establishments ended for reasons unrelated to her ailments. (Tr. 68-69). Plaintiff indicated that her back problems prevent her from returning to either of these jobs. (Tr. 69).

### III. MEDICAL EVIDENCE RELATING TO IQ SCORES[3]

The record contains school records from Plaintiff's high school, Sand Creek High School. (Tr. 722-28). The records show that Plaintiff underwent a number of cognitive functioning tests between 1965 and 1973. (Tr. 726). In particular, Plaintiff was administered the "Otis", "California Mental Maturity", "WRAT-WISC-GDM" and "WISC-Bender-WRAT" tests. (*Id.*). Based upon this testing, her records state the following: "This child was found [to] be functioning in a retarded range of intell[egence]. . . Certified for continued placement in type A classroom. Eligible for continued placement in R.R." (*Id.*).

In one particular record, the following data appears: "L IQ 67", "NL IQ 64", and "T IQ 62". (Tr. 728). Plaintiff contends these notations refer to her IQ scores. The ALJ conceded that these numbers possibly represented Plaintiff's IQ scores, arguably Plaintiff's "language" and "non-language" abilities. (Tr. 728, 28).

In November 2008, Plaintiff presented to J. Bruce Kelly ("Kelly"), a psychologist, for a mental status evaluation. (Tr. 521-37). As part of his evaluation, Kelly administered Plaintiff the Wechsler Adult Intelligence Scale – Third (WAIS-III) test. (Tr. 526-28). Plaintiff received a verbal score of 62, a performance score of 68 and a full scale score of 62. (Tr. 526). Kelly commented that Plaintiff's full scale score placed her within the "Extremely Low average range of intellectual functioning". (Tr. 527). The psychologist noted the large discrepancy between Plaintiff's verbal score and her performance score. Thus, he concluded that there was a 95% chance that Plaintiff's IQ fell between 59-67. (*Id.*).

---

[3] The following summary of Plaintiff's medical record is not intended to reflect all of the evidence of record, nor all of the information the undersigned took into consideration when making its ruling.

4

Based on Kelly's examination and testing, he opined that Price's cognitive skills placed her within the mild mental retardation range. (Tr. 524). However, Kelly did not believe Price's testing scores were a true reflection of Price's overall functioning because Kelly noted the scores were inconsistent with Plaintiff's history. (Tr. 525). Most notably, Kelly indicated that it was "unlikely that someone with mild mental retardation would not [have] receive[d] special education services until the 7th grade[; or would have] only repeat[ed] one grade in elementary school." (*Id*.). In summarizing his findings, Kelly stated that Price suffered from a learning disorder. (Tr. 535). But, the psychologist again noted that he was reluctant to diagnose her with mild mental retardation given that she was enrolled in regular classes until the seventh grade. (*Id*.). Therefore, Kelly noted that more information from Plaintiff's developmental period was needed before he could make such a diagnosis. (*Id*.).

IV. VOCATIONAL EXPERT TESTIMONY

During the hearing, the vocational expert ("VE"), Katherine Schrot, testified regarding Plaintiff's prior work history and the availability of prospective jobs meeting certain qualifications posed by the ALJ and Plaintiff's counsel. (Tr. 86-106). The VE classified Price's former position as a greenhouse worker as falling into the "heavy" exertional category, and having a specific vocational preparation ("SVP") rating of 2.[4] (Tr. 88). However, the VE noted that Plaintiff did not perform the position at the "heavy" exertional level, but at the "light" to "medium" exertional levels. (Tr. 88-89). With regard to Price's prior work as a kitchen helper and general laborer, the VE indicated that both these positions were classified as requiring

---

[4] The regulations classify work into five categories: sedentary, light, medium, heavy, and very heavy. 20 C.F.R. §§ 404.1567, 416.967.

5

"medium" exertion, and had an SVP rating of 2. (Tr. 89). But, the VE indicated that Plaintiff performed the kitchen helper position at the "sedentary" level. (*Id*.).

The ALJ then posed a hypothetical question to the VE asking her to identify whether a person of Plaintiff's age, education and vocational background could perform any of Plaintiff's prior jobs if the person were limited as follows: the individual could only perform work having an SVP rating of 1 or 2, productivity could not be controlled by an external source over which the person had no control, and the work could not be interdependent on other's work. (Tr. 90). In response, the VE stated that such a person would be able to perform Plaintiff's former position as a kitchen helper as Price had performed the job. (*Id*.).

Upon further questioning, the VE found that the individual would not be able to perform this job, however, if she required a sit/stand option. (*Id*.). But, the VE testified that the individual would be able to work as a small products assembler, production helper or printed products assembler. (Tr. 90-91). The VE added that these jobs existed in the following numbers in the state of Ohio respectively, 8,000, 12,000, and 5,000, which the VE said she gathered from the Ohio Department of Job and Family Services. (*Id*.; Tr. 97). Additionally, the VE found that the national job incidences for these jobs could be calculated by multiplying the state job incidence number by 35. (*Id*.). Lastly, the VE confirmed that all three positions had an SVP rating of 2. (Tr. 90-92).

Following this testimony, Plaintiff's counsel questioned the VE regarding various aspects of her testimony. (Tr. 95-106). For example, counsel questioned the VE's use of a multiplier of 35 to determine the national job incidence figures provided. (Tr. 97-98). The VE explained that she used a multiplier of 35 to account for larger and smaller states in the nation. (*Id*.). In addition, the VE admitted that the Dictionary of Occupational Titles ("DOT") did not reference

6

whether the jobs she listed provided an option to sit and/or stand. (Tr. 98). The VE testified that she based this consideration on her personal experience expanding over 20 years. (*Id.*). Finally, counsel questioned the VE regarding the reading, math and language requirements necessary to learn and perform the jobs identified by the VE in response to the ALJ's hypothetical questions. (Tr. 101-05).

## V. ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act from October 1, 2004 through December 30, 2004.

2. The claimant engaged in substantial gainful activity since December 30, 2004, the alleged onset date.

3. The claimant has the following severe impairments: borderline intellectual functioning/learning disorder; mild degenerative joint disease of the lumbar spine; mild thoracic/lumbar scoliosis; and obesity.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the physical residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She retains the mental residual functional capacity to perform work designated as SVP of 1 to 2 that is repetitive and work wherein the pace of productivity is not dictated by an external source which the claimant has no control over such as an assembly line or conveyor belt. She has no problems relating to others, but her work should not be interdependent upon another employee's work.

6. The claimant is capable of performing past relevant work as a kitchen helper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 18, 2002, through the date of this decision.

(Tr. 27-41) (internal citations omitted).

## VI. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## VII. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001)*; Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed*. Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)*; Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.

1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VIII. ANALYSIS

Plaintiff presents two assignments of error attacking the ALJ's decision. First, Plaintiff contends the ALJ failed to properly consider her IQ scores when considering whether her impairments met or equaled listing level at step three of the analysis. Second, Price presented a host of arguments contesting the legitimacy of the VE's testimony and thereby challenging the ALJ's reliance upon such. After review of the record, the undersigned finds remand is necessary.

### A. Listing 12.05(C)

At the third step of the disability evaluation process, the ALJ must evaluate whether the claimant's impairments satisfy the requirements of any of the medical conditions enumerated in the Listing of Impairments within 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). *See* 20 C.F.R §§ 416.920(a)(4)(iii), 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments recites a number of ailments which the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 416.925(a), 404.1525(a). Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 416.925(c)(3), 404.1525(c)(3).

A claimant will be deemed disabled if his impairment(s) meet or equal one of these listings. In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled at this stage if his impairments "medically equal" the listing. 20 C.F.R. §§ 416.926(b)(3), 404.1526(b)(3). To do so, the claimant must show that his impairments are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R §§ 416.926(a), 404.1526(a).

The Social Security regulations recognize mental retardation as a disabling condition under Listing 12.05. *See* 20 C.F.R. Pt 404, Sbpt P, App. 1, § 12.05. Plaintiff asserts that the ALJ erred in concluding that her IQ scores did not satisfy the requirements of Listing 12.05(C), which provides:

> § 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D, are satisfied.
>
> . . .
>
>     C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function
>
> . . .

*Id*.

At step three of the analysis in the instant case, the ALJ specifically held that Price's impairments did not meet or equal Listing 12.05(C). The ALJ based this finding on several

factors.  First, the ALJ discredited Price's IQ scores from 1969, reflecting scores between 60 and 70.  Second, the ALJ discredited Plaintiff's more recent IQ scores from 2008, also reflecting scores between 60 and 70.  And finally, the ALJ ruled that even if she had accepted these scores, Plaintiff still would not have satisfied the criteria of Listing 12.05(C) because Plaintiff did not suffer deficits in adaptive functioning as required by the listing.  Upon review of the record, the Court finds that substantial evidence does not support the ALJ's decision to discredit Price's IQ scores from 2008, nor does it support the ALJ's finding regarding Plaintiff's deficits in adaptive functioning.

  Plaintiff presented the ALJ with two sets of IQ scores.  To begin, Price submitted records from her school which detailed testing she underwent in the seventh grade.  (Tr. 722-28).  The undersigned finds that it was reasonable for the ALJ to question the significance of these test results.  As the ALJ noted, Plaintiff was unable to confirm whether these IQ scores were derived from standardized psychological tests or whether the tests were administered by certified or qualified personnel.  Without such proof, there was no means by which the ALJ could determine the validity of the IQ scores with respect to the listing requirements.

  However, the ALJ's discussion of the IQ scores recorded in 2008 is more troublesome. Although the listing requires the claimant to establish the onset of her impairment prior to reaching 22 years of age, courts have permitted claimants to rely on IQ scores attained after the claimant's 22nd birthday to reflect the individual's cognitive functioning prior to the individual's 22 birthday.  *See McPeek v. Sec'y of Health & Human Servs.*, 19 F.3d 19 (6th Cir. 1994) (Table) ("To require . . . that Section 12.05(C) claimants come forward with the results of an intelligence test administered during the claimant's developmental period would foreclose recovery by all who were unfortunate enough to lack early access to appropriate testing").

11

In this case, Plaintiff attempted to establish the listing's IQ requirement by demonstrating the symmetry between the IQ scores attained by Kelly in 2008 and those attained by her school in 1969. Moreover, Plaintiff attempted to prove that the only reason Kelly discounted her IQ scores from the tests he administered was because he had faulty information regarding Plaintiff's educational background in elementary school. However, the ALJ rejected Plaintiff's argument.

In her written opinion, the ALJ acknowledged that Kelly's findings were based upon the erroneous belief that Plaintiff attended regular classes through the sixth grade, and only repeated one grade. The truth is actually drastically different. The ALJ highlighted that Plaintiff repeated two grades: kindergarten and first grade, and began taking special education classes in the second grade, not the seventh. But despite acknowledging this discrepancy, the ALJ concluded that there was no way to verify that the scores established by Kelly were consistent with the scores noted in 1969. The ALJ explained that because the school records were so dated, it was not clear whether the definition of mental retardation assigned to Price in 1969, matched the definition assigned to the term today.

The undersigned finds this was not a sufficient reason to discredit the IQ scores found by Kelly. As previously mentioned, a claimant may rely upon IQ scores derived after age 22 to satisfy the listing's requirements. *See McPeek*, 19 F.3d 19. Accordingly, after the ALJ discounted Price's IQ scores from 1969, it was reasonable for Plaintiff to rely upon the scores determined by Kelly in order to demonstrate the listing's criteria. While there certainly may be differences in the way the medical world views and categorizes mental retardation today as compared to when Price was a child, those differences do not completely disannul Plaintiff's school records. The undersigned notes that regardless of any difference, both sets of IQ scores fall within the same range. Thus, even though advancement in the medical field *may have*

changed the medical definition or parameters of the term "mental retardation", Plaintiff's IQ scores between then and now have remained about the same. This is important because their consistency tends to affirm the validity of both scores. As a consequence, the undersigned finds the ALJ did not provide a legitimate reason for discrediting Kelly's scores, particularly after the ALJ dispelled Kelly's reasons for invalidating his findings. These scores are parallel to Plaintiff's scores from 1969, valid or not, and were sufficient to establish the requisite IQ in Listing 12.05(C).

Regardless of the undersigned's dissatisfaction with the ALJ's reasons for discrediting the significance of the IQ scores reached by Kelly, the ALJ's ruling also fails on other grounds. The ALJ ultimately concluded that Plaintiff did not meet or equal Listing 12.05(C) because Plaintiff did not exhibit deficits in adaptive functioning as required in the introductory paragraph of the listing. The ALJ concluded that Plaintiff did not satisfy this portion of the listing because despite her IQ scores, Price had been able to maintain employment throughout several years of her adulthood. The ALJ also noted that Plaintiff testified that she left her jobs for reasons unrelated to her mental condition, and that she would still be working if it were not for these conditions. In addition, the ALJ highlighted that Plaintiff was able to perform a number of daily tasks, such as caring for her own hygiene, cooking, watching television and occasionally shopping—activities which the ALJ found to be inconsistent with having deficits in adaptive functioning.

The ALJ's analysis of this issue is contrary to established case law. As Plaintiff noted, the Sixth Circuit has addressed what types of daily activity and work history undermines IQ scores suggesting that an individual is mentally retarded. In *Brown v. Secretary of Health & Human Servs.*, 948 F.2d 268, 269-70 (1991), the Sixth Circuit ordered remand, finding that the

ALJ improperly concluded that Brown's prior work history and daily activities undermined his IQ score. In that case, Brown alleged disability under Listing 12.05(C). *Id.* at 269. Brown had an IQ score of 68, but the ALJ deemed his score invalid noting that despite this low score suggesting mild mental retardation, Brown retained the ability to: use public transportation, obtain a driver's license, visit friends, make change at the grocery store, launder his clothing, clean his room, complete the sixth grade and work as a truck driver which required him to keep track of his mileage and the places he traveled. *Id.*

Nevertheless, the Sixth Circuit found that these activities were not representative of a person with an IQ score greater than 68. In doing so, the Court noted that the *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1987) ("DSM-III-R") described mild mental retardation as follows:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment of those with the disorder –about 85%. People with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens *they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support,* but may need guidance and assistance when under unusual social or economic stress. At the present time, *virtually all people with Mild Mental Retardation can live successfully in the community, independently* or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*Id.* at 270 (*citing* DSM-III-R § 317.00) (emphasis in original). Accordingly, the Court found that Brown's work history and daily activities fit squarely within this profile, and it was improper for the ALJ to reject Brown's IQ scores based on the stated reasons. *Id*. Furthermore, the Court added that the ALJ could have ordered Plaintiff to undergo additional IQ testing if the ALJ were certain that Brown's test scores were invalid, but that the ALJ failed to do so. *Id*.

The facts in the case *sub judice* are parallel to the facts in *Brown* and persuade the undersigend that remand is necessary. Here, the ALJ largely discredited Price's IQ scores based upon her ability to work and perform routine daily activities. The ALJ's description of Price's daily activities are akin to those at issue in *Brown*. The ALJ was compelled by Plaintiff's ability to perform rudimentary tasks such as light cleaning, minor cooking and grooming. But, as the Sixth Circuit held in *Brown*, the fact that one can complete these tasks does not belie a diagnosis of mild mental retardation. Likewise, one's ability to maintain employment does not undermine this finding as the DSM-III-R also recognizes that individuals suffering from mild mental retardation may also be able to achieve vocational skills and live successfully and independently. *Id*.

This is not to say that it will never be appropriate to question a claimant's IQ scores based on his or her past work history and daily activities. Of note, this Court has previously distinguished *Brown* and upheld an ALJ's decision to discount IQ scores. *See Brooks v. Astrue, No. 08-CV-2608, 2010 WL 1254323 (N.D.Ohio Mar. 24, 2010) (O'Malley, J.)*. In *Brooks*, the Court upheld the ALJ's rejection of the claimant's IQ scores finding that the low score was refuted by the evidence of record demonstrating that Brooks was able to engage in an array of daily activities and maintain employment. *Id*.

Although the Court found that Brooks' daily activities were similar to those of Brown, the Court distinguished *Brown* on two basis. First, the Court explained that Brooks' past work experience involved jobs with more complicated tasks than Brown's job as a truck driver. *Id. at *9*. For example, Brooks was a certified state tested nurse's assistant (STNA) and had worked as a nurse's assistant, *id. at *8*, whereas Brown's position as a truck driver only required him to record basic data. Second, the Court noted that Brooks had been diagnosed with borderline

15

intellectual functioning ("BIF") – a diagnosis which was inconsistent with her IQ score which fell within the mild mental retardation range. *Id*. at *8-9. The Sixth Circuit indicated Brooks' diagnosis alone inherently called her IQ score into question because it signaled that her impairments did not meet the mild mental retardation level, but constituted something less severe. *Id*. at *9. The Court noted that there was no such diagnosis present in Brown undermining his IQ scores. *Id*.

Based upon a review of the record, the undersigned finds that Price's case does not fall into either of the exceptions noted by *Brooks*. Price's former employment only encompassed unskilled jobs.[5] None of her prior work required her to perform semi-skilled or complicated tasks, as was the case in *Brooks*.[6] In addition, although the ALJ found Plaintiff to suffer from the severe impairment of "borderline intellectual functioning/learning disorder", the undersigned was unable to verify where any doctor had actually diagnosed Plaintiff with BIF. Nor did the Commissioner identify such a diagnosis. In fact, to the contrary, on several occasions Kelly indicated that Plaintiff's cognitive skills fell within the mild mental retardation range.

Kelly was reluctant to diagnosis Price with mild mental retardation based upon his understanding of Price's past educational history. It appears Kelly was particularly perplexed by how a person with Plaintiff's IQ scores would not have received special education services until

---

[5] The VE testified that Plaintiff's past relevant work entailed positions with an SVP of 2. (Tr. 89-90). Unskilled jobs are classified as having a rating of SVP 1 or 2. *See* SSR 00-4p, 2000 WL 1898704, at *3 (2000).

[6] The undersigned also notes that a person may choose to work despite her impairments. Yet, one's personal determination to work, does not necessarily or automatically prevent the individual from being found disabled. *See Cohen v. Sec'y of Dep't of Health & Human Servs., 964 F.2d 524, 530 (6th Cir. 1992)* ("Claimant should not be penalized because he had the courage and determination to continue working despite his disabling condition.") (*quoting Wilcox v. Sullivan, 917 F.2d 272, 277) (6th Cir. 1990)*).

the seventh grade, and only have repeated one grade in elementary school. But, as the ALJ noted, Kelly had good reason for being puzzled by such circumstances, as this was not truly the case for Price. Given the ALJ's awareness of the faulty information upon which Kelly's opinion was based, the undersigned finds that instead of discrediting Plaintiff's IQ scores, the ALJ could have considered ordering Price to undergo new IQ testing, as suggested in *Brown*. There, the Sixth Circuit noted that if the ALJ were certain that Brown's initial scores were invalid, he could have administered a second test, but failed to do so. *Brown*, 948 F.2d at 270. Likewise here, particularly in light of the ALJ's rejection of Plaintiff's original IQ scores and her knowledge of the reasons for which Kelly questioned Plaintiff's IQ scores, it would have been beneficial for the ALJ to order additional testing. The ALJ will now have a second chance to consider doing so. Regardless, the ALJ's ruling at step three of the analysis is contrary to established case law and warrants remand.

### B. VE's Testimony

Although the undersigned finds remand proper due to the ALJ's errors in evaluating whether Plaintiff met or equaled Listing 12.05(C), the undersigned will briefly address Plaintiff's objections regarding the VE's testimony.

At the onset, the undersigned notes that "[i]t is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses. . .". *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Notwithstanding, the ALJ's credibility findings must be supported by the record, and cannot be based solely upon "intangible or intuitive notion[s]" about the individual. *Id.* A reviewing court must accord the ALJ's credibility determination "great weight and deference particularly since the ALJ has the opportunity . . . of observing a

witness's demeanor while testifying." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009) (*citing Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)).

Plaintiff asserted a number of objections to the VE's testimony, some of which the ALJ will need to address on remand.[7] To begin, Plaintiff objected to the VE's use of regional job incidence figures when responding to the ALJ's hypothetical questions, instead arguing that the VE should have provided national job incidence numbers. However, as noted by Defendant, the regulations state that work will be deemed to exist in significant numbers in the national economy when it "exists in significant numbers in either the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A) (2004). Therefore, an ALJ's step five ruling may be based upon the VE's identification of jobs existing in significant numbers in the region where the claimant resides. *See Kelly v. Sec'y of Health & Human Servs.*, 842 F.2d 331 (6th Cir. 1988) (Table) ("1500 jobs in the regional economy must be found to satisfy the significant numbers requirement"); *see also Pollice v. Sec'y of Health & Human Servs.*, 843 F.2d 1392 (6th Cir. 1988) (Table) (a significant number of jobs in the national economy may be demonstrated by showing a significant number of jobs in the state).

Next, Plaintiff contested what she deemed as the VE's arbitrary decision to use a multiplier of 35 to convert regional job incidence figures to national figures. But, the ALJ accepted the VE's calculation. The VE explained that she chose a multiplier of 35 because of the differing sizes of the states in the nation. The ALJ credited this explanation, and the undersigned

---

[7] The undersigned notes that the ALJ found Plaintiff capable of performing her past work as a kitchen helper at step four of the analysis. However, given the ALJ's improper rejection of Plaintiff's IQ scores, the ALJ may not reach the same conclusion on remand. Thus, it is necessary for the undersigned to at least briefly address the faults within the ALJ's step-five determination.

sees no reason to question the ALJ's ruling. The ALJ repeatedly noted that the VE had extensive professional experience spanning over 20 years. The ALJ found the VE's testimony to be adequate and persuasive in light of her experience. Accordingly, the undersigned does not find any error with respect to the ALJ's reliance upon the VE's job incidence figures, as the ALJ's credibility findings are entitled to great deference. *Jones*, 336 F.3d at 476.

Plaintiff also vigorously challenged the ALJ's reliance on the jobs identified by the VE at step five of the analysis, arguing that they required mental aptitudes greater than that possessed by Price. Because the ALJ discredited Plaintiff's IQ scores and deficits in adaptive functioning for improper basis, there may be some merit to Plaintiff's challenge herein. During and after the hearing, counsel argued that the jobs identified by the VE, and relied upon by the ALJ, required greater mental aptitudes than what Plaintiff possessed. In light of ALJ's errors discussed herein, it is at least possible that Plaintiff's contentions are true. On remand, the ALJ will have another opportunity to assess Plaintiff's mental impairments and render an appropriate residual functional capacity determination. If vocational expert testimony is required, the expert will then be able to testify whether there are jobs existing in the national economy which Plaintiff could perform.

## IX.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court recommends that the decision of the Commissioner be **REVERSED** and the case be **REMANDED** back to the administration.

s/ Kenneth S. McHargh  
Kenneth S. McHargh  
United States Magistrate Judge

Date: July 11, 2013.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn, 474 U.S. 140 (1985)*; *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).